**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI—EASTERN DIVISION**

| | | |
|---|---|---|
| **TYLER COBB and JORDAN HEITMANN,** individually and on behalf of all others similarly situated, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | Case No.: 4:19-cv-2446 |
| *v.* | ) ) | |
| **JUUL LABS, INC.,** | ) ) | **JURY TRIAL DEMANDED** |
| *Defendant.* | ) | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs Tyler Cobb and Jordan Heitmann, individually and on behalf of all others similarly situated, allege the following upon information and belief, except the allegations concerning their own respective experiences, which are based on personal knowledge.

<u>**INTRODUCTION**</u>

1.      Both Cobb and Heitmann began "JUULing" as minors.

2.      JUULing refers to the use of specific electronic vaping devices made by Defendant JUUL Labs.



3.      The user loads a "JUULpod," filled with a flavored liquid containing nicotine and other chemicals, into the JUUL vaping device.  Powered by a battery that is charged through a USB port, the JUUL device heats the liquid, converting the liquid into a vapor that the user breathes in through the mouth like someone smoking a cigarette.



4.      Through its marketing and promotional efforts, including a strong social media presence on platforms popular with young people, JUUL Labs introduced Cobb and Heitmann to nicotine.

5.      Before JUUL, neither of them had smoked, vaped, or used any other tobacco or nicotine containing products.

6.      When they started using JUUL Labs' products, neither of them knew that the JUULpods they were using contained nicotine.  All they knew was that they liked the way the flavored vapor tasted.

7.     It was not until later that Cobb and Heitmann came to know that there was nicotine in the JUULpods, but even then they did not understand or appreciate the amount of nicotine that they were taking in.

8.     And they are not alone: "Two-thirds of JUUL users ages 15 through 24 "do not know that JUUL always contains nicotine."[1]

9.     The Surgeon General and other governmental and health authorities have "singled out" JUUL Labs and its products for fueling the "epidemic" of "youth vaping," they being largely responsible for driving the "largest ever recorded [increase in substance abuse] in the past 43 years for any adolescent substance use outcome in the U.S."[2]

## PARTIES

10.     Plaintiffs bring this action individually and on behalf of a class of persons consisting of similarly situated Missouri residents, as set forth more fully below.

### Tyler Cobb

11.     Cobb resides in Lincoln County, Missouri.

12.     At age fifteen, as a sophomore in high school, he started JUULing.

13.     He had seen JUUL Labs' products on YouTube as well as on Instagram, trending with the hashtag "#JUUL," among other social media platforms.  He also saw JUUL Labs' advertisements for its products at gas stations, including large window stickers on the front

---

[1] Surgeon General's Advisory on E-Cigarette Use Among Youth, Dec. 18, 2018, https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

[2] Surgeon General Warns Youth Vaping Is Now An "Epidemic," Dec. 18, 2018, https://www.npr.org/sections/health-shots/2018/12/18/677755266/surgeon-general-warns-youth-vaping-is-now-an-epidemic; University of Michigan Institute for Social Research, *National Adolescent Drug Trends in 2018*, Dec. 17, 2018, http://monitoringthefuture.org/pressreleases/18drugpr.pdf.

windows of the gas station, and the products themselves offered for sale in standalone cases with signs advertising discounted pricing and "multi-packs."

14.     He went online to try to figure out what the "3% strength" and "5% strength" designations on the packaging meant and he saw JUUL Labs' representation that each JUULpod contained about as much nicotine as a pack of cigarettes.  He could not, however, find a clear answer on what the 3% and 5% designations signified.

15.     None of the marketing or promotional efforts that Cobb saw when he began using JUUL Labs' products disclosed the existence and/or amount of nicotine in the JUULpods or alerted him to the patented "nicotine salt" formulation that would make the consumption of the nicotine in the JUULpods so much easier than the nicotine from a cigarette.

16.     Cobb has not tried the "Virginia Tobacco" or "Classic Tobacco" JUULpods.  He has, however, tried just about every other flavor, including "Mango," "Mint," "Fruit Medley," and "Crème Brulée."  His favorite JUULpods were the Mango flavored ones until the sales of those were limited to online purchases.  Now he uses the Mint flavored JUULpods.

17.     As a direct and proximate result of JUUL Labs' conduct, Cobb (i) is addicted to nicotine, (ii) has been exposed to toxic chemicals like formaldehyde and propylene glycol, among others, (iii) has experienced adverse physiological, emotional, and mental changes, and (iv) has sustained economic harm in that, had JUUL Labs told him what was to come with its products, they would not have been purchased.

**Jordan Heitmann**

18.     Heitmann resides in Crawford County, Missouri.

19.     At age seventeen, as a senior in high school, he started JUULing.

20.     He had seen JUUL Labs' advertisements for its products primarily at gas stations and other retail stores, including large window stickers on the front windows of the stores, and the products themselves offered for sale at discounted prices and with promotional gift cards for the purchase of more "starter-kits" and JUULpods at a later date.  These marketing and promotional efforts ushered Heitmann towards nicotine addiction at very little cost to him, at least initially.

21.     He also saw on JUUL Labs' website the representation that each JUULpod contained about as much nicotine as a pack of cigarettes.

22.     None of the marketing or promotional efforts that Heitmann saw when he began using JUUL Labs' products disclosed the existence and/or amount of nicotine in the JUULpods or alerted him to the patented "nicotine salt" formulation that would make the consumption of the nicotine in the JUULpods so much easier than the nicotine from a cigarette.

23.     For the last year and a half, Heitmann has needed to JUUL consistently and often, to the point that he is practically never without his JUUL vaping device.  On occasions when he is without his device or unable to afford the JUULpods, Heitmann resorts to using other sources of nicotine, such as chewing tobacco, Marlboro cigarettes, or some other vaping device to curb the craving for nicotine.

24.     He has observed a change in the youth of his hometown because of JUUL Labs. Before JUUL Labs, teenagers would sneak a cigarette here and there, but, now, with how easy the JUUL vaping device is to conceal and the absence of the telltale smell, teenagers are using JUUL Labs' products much more heavily, inhaling the stronger doses of more concentrated nicotine.

25.     As a direct and proximate result of JUUL Labs' conduct, Heitmann (i) is addicted to nicotine, (ii) has been exposed to toxic chemicals like formaldehyde and propylene glycol, among others, (iii) has experienced adverse physiological, emotional, and mental changes, as well

as substantial weight loss, and (iv) has sustained economic harm in that, had JUUL Labs told him

what was to come with its products, they would not have been purchased.

**JUUL Labs**

26.     JUUL Labs is, and was at all relevant times, a Delaware corporation having its

principal place of business in California.   JUUL designs, manufactures, markets, promotes,

distributes, and sells JUUL branded vaping devices and JUULpods.

27.     Since its launch in 2015, JUUL Labs has become the dominant manufacturer in the

electronic nicotine delivery system ("ENDS") market in the United States.   In 2018, JUUL Labs

amassed more than $1 billion in revenue.[3]  Also in late 2018, leading U.S. cigarette manufacturer

Altria bought a 35% stake in JUUL Labs for $12.8 billion.

## JURISDICTION AND VENUE

28.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)

because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest

and costs, is a class action in which at least one plaintiff is a citizen of a state different from the

defendant, and the proposed class consists of more than 100 members.

29.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part

of the events or omissions giving rise to this claim occurred here.

## BACKGROUND

30.     The JUUL vaping device resembles a USB flash drive, it can re-charge in a laptop

computer, and it can be concealed in the hand.   It measures about 3 ½ inches long and about ½ an

inch wide.

---

[3] San Francisco Chronicle, *JUUL revenue reaches $1 billion*, Jan. 31, 2019,
https://www.sfchronicle.com/business/article/Juul-revenue-reaches-1-billion-sales-of-pods-13577330.php?psid=iRKsO



31.     The vapor that is exhaled quickly dissolves into the air and its odor is subtle and faintly sweet, unlike the typically acrid smell of "combustible" tobacco.

32.     The thin, rectangular JUUL device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor.

33.     A light embedded in the JUUL device is the battery level indicator and lights up in a "party mode" display of colors when the device is waved around.

34.     Each JUULpod encases 0.7 milliliters of JUUL Labs' patented nicotine liquid solution and a coil heater.

35.     When the sensor in the JUUL device detects use,  the  heating element activates, which  in  turn converts the nicotine liquid solution from the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol.

36.     The electronics within the JUUL device are designed to determine the amount of nicotine that the user inhales with each breath taken from the device.  By altering the temperature, puff duration, and airflow, among other things, JUUL Labs precisely controls the amount of nicotine that is delivered.

37.     Part of that design is that the liquid from the JUUL pods can be consumed quickly, so that users can inhale more nicotine quicker from the JUUL device than they can with conventional cigarettes.

38.     And not only can the JUUL device deliver a large amount of nicotine to the body quickly, it makes it easy to do.

39.     JUUL Labs mixes its nicotine with benzoic acid, creating a patented "nicotine salt" with a pH lower than that of the "freebase" nicotine generally used in conventional cigarettes and even other vaping devices.

40.     With the addition of benzoic acid, the nicotine can be inhaled without the initial harshness, or "throat hit" that is concomitant with cigarette smoking.  The JUUL device gives a smoother and more pleasant inhalation experience, all while delivering a higher concentration of nicotine than cigarettes and with a more efficient rate of absorption.

41.     Studies have shown that the "decrease in the perceived harshness" of the nicotine inhalation leads to "a greater abuse liability."[4]

42.     Not only is the nicotine from JUUL Labs' products more easily consumed, there is more of it for consumption.

43.     In direct contrast to JUUL Labs' representations that its JUULpods contain about the same amount of nicotine as a pack of conventional cigarettes, studies have shown that the JUULpods contains significantly higher concentrations of nicotine than that of cigarettes and absorption rates that are up to four times higher than that of cigarettes.[5]

---

[4] Anna K. Duell, et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by $^{1}H$ NMR Spectroscopy*, Chem. Res. Toxicol., May 18, 2018, at 431-34, https://pubs.acs.org/doi/10.1021/acs.chemrestox.8b00097.

[5] *See, e.g.,* Samantha M. Reilly, et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by Juul Electronic Cigarettes*, Nicotine & Tobacco Research, Sep. 2019, at 1274-78; *E-Cigarettes*, https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf.

44.    For instance, where one cigarette delivers, overall, 5-7% of its actual nicotine content, an average pack of cigarettes would deliver between 19-27 mg of nicotine to the smoker.[6] This is less than half of the amount of nicotine that a JUULpod provides, and adding to that a higher delivery efficiency (82% a rough estimate[7]), JUULpods are delivering substantially higher amounts of nicotine to users' bloodstreams and brains than the cigarettes to which JUUL Labs claims equivalency.

45.    And that is just going by the nicotine amounts that JUUL Labs represents its JUULpods as having.  Studies have also shown that the JUULpods advertised as having the "5% strength" actually contain concentrations of 6.2% nicotine salt, and other studies have shown even higher concentrations than that.[8]

46.    The Surgeon General has warned that the use of nicotine salts, like JUUL Labs' formulation, "which allow particularly high levels of nicotine to be inhaled more easily and with less irritation than the free-base nicotine than has traditionally been used," would be "of particular concern for young people, because it could make it easier for them to initiate the use of nicotine through these products and also could make it easier to progress to regular e-cigarette use and nicotine dependence."[9]

---

[6] *See, e.g.,* Tameka S. Lawler, et al., *Surveillance of Nicotine and pH in Cigarette and Cigar Filler*, Tobacco Regulatory Science, Apr. 2017, at 101-116, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5628511/pdf/nihms897902.pdf; Martin J. Jarvis, et al., *Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, JNCI Journal of the National Cancer Institute, Feb. 2001, file:///C:/Users/smorgan/Downloads/Nicotine_Yield_From_Machine-Smoked_Cigarettes_and_.pdf.

[7] *See, e.g.,* Reilly, *Free Radical, Carbonyl, and Nicotine Levels*.

[8] *See, e.g., id.*; James F. Pankow, et al., *Benzene formation in electronic cigarettes*, PLoS ONE, Mar. 8, 2017, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5342216/pdf/pone.0173055.pdf.

[9] Surgeon General's Advisory, https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.

9

47.     When the "speed and magnitude of nicotine delivery" is a primary factor in getting someone addicted to nicotine,[10] JUUL Labs' patented nicotine salt formulation has paid off.[11]

48.     Considering the design of its device and the specially formulated contents of its JUULpods, JUUL Labs made its products specifically for the purpose of creating, nurturing, and sustaining nicotine addiction.

**Following in the Footsteps of Big Tobacco**

49.     James Monsees, one of JUUL Labs' founders, described the cigarette as "the most successful consumer product of all time … an amazing product."

50.     According to Monsees, JUUL Labs aimed to "deliver[] solutions that refresh the magic and luxury of the tobacco category"—a category of products that, as Monsees described, have "kill[ed] more than half of all people who use them long-term."

51.     Then, boasting: "That got us interested."[12]

52.     He and co-founder Adam Bowen turned to the "'Master Settlement Agreement,' [from] the big settlement where everyone was suing the tobacco companies and there was one master lawsuit that was kind of rolled together." He explained that "[o]ne of the results [of the tobacco litigation] was that a lot of tobacco industry documentation was mandated to become public," allowing them "to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[13]

---

[10] Dorothy K. Hatsukami, et al., *Tobacco Addition: Diagnosis and Treatment*, The Lancet, Jun. 14, 2008, at 2027-38, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4732578/.

[11] Duell, *Free-Base Nicotine Determination*, at 433 (noting that JUUL Labs' use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth").

[12] Forbes India, *Billionaires-to-be: Cigarete breakers*, Oct. 12, 2018, http://www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1.

[13] Social Underground, PAX Labs: Origins with James Monsees, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

53.     Part of what JUUL Labs took from tobacco litigation documents were the industries' advertising strategies, *i.e.*, the same ones that attracted people to the "the leading cause of preventable death" and that tobacco companies are prohibited from using now.[14]

54.     In a 2018 interview, Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that even anti-tobacco research undertaken by the Stanford University School of Medicine about tobacco advertising had been quite useful to them.[15]

55.     Monsees later said that he had learned what "not to do" from those documents.[16] But JUUL Labs' actual marketing and promotional efforts speak for themselves; and what he really learned is evident from the similarity of JUUL Labs' advertising to that by Marlboro, "the most popular cigarette brand in the United States, with sales greater than the next seven leading competitors combined … [and one of] [t]he three most heavily advertised brands … [that] continue to be the preferred brands of cigarettes smoked by young people":[17]

---

[14] Centers for Disease Control and Prevention, *Fast Facts*, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/fast_facts/index.htm.

[15] Robert K. Jackler, et al, *JUUL Advertising Over Its First Three Years on the Market*, Jan. 21, 2019, at p. 27, http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[16] Time, *JUUL Executive Tells Lawmakers Electronic Cigarettes Were Never Intended for Teens*, Jul. 26, 2019, https://time.com/5635939/juul-james-monsees-testifies-electronic-cigarettes-teens/.

[17] Centers for Disease Control and Prevention, *Tobacco Brand Preferences*, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/tobacco_industry/brand_preference/index.htm.



**Leading Youth Cigarette Initiation Brand**







**Leading Youth e-Cigarette Initiation Brand**

























JUUL®
FLAVOR MULTIPACK
4 Pods
5.0% Strength
Mint
Virginia Tobacco
Creme
Mango
The Alternative For Adult Smokers

Nothing about our cigarettes or packaging, including color, should be interpreted to mean that any cigarette is safer than any other cigarette. Nothing about our cigarettes will help you quit smoking.
SURGEON GENERAL'S WARNING: Smoking By Pregnant Women May Result in Fetal Injury, Premature Birth, And Low Birth Weight.
Marlboro 72s
NEVER SHORT ON FLAVOR
NOW AVAILABLE IN BLACK MENTHOL
DISCOVER THE FLAVOR
AT MARLBORO.COM

JUUL

MARLBORO
BEAT
WWW.MARLBORO.CH
17-22 JUILLET
PALEO FESTIVAL NYON
BE
Marlboro

MAYBE
NEVER
FELL IN
LOVE
BE
Marlboro

JUUL

56.      JUUL Labs mimicked other popular cigarette brands too:

 

 










57.     Stanford University School of Medicine researchers found not just similarities in the aesthetics between JUUL Labs' and old tobacco advertising, but themes too: "JUUL [Labs'] principal advertising themes have been closely aligned with that of traditional tobacco advertising (pleasure/relaxation, socialization/romance, flavors, cost savings and discounts, holidays/seasons, style/identity, and satisfaction)."[18]

58.     Lacking both nicotine and underage use warning messages, JUUL Labs' early marketing "featured patently youth-oriented imagery and messaging":[19]



---

[18] *See, e.g.,* Jackler, *JUUL Advertising*, at p. 27.

[19] *Id.*











59.     JUUL Labs "also sought individuals who were popular on the internet, enrolled them in JUUL's affiliate program, and compensated them for posting positive reviews while insisting that they not reveal the relationship."[20]  This included social media stars and influencers who used social media newsfeeds to promote JUUL Labs' products.

60.     JUUL Labs' own social media presence was expansive, and it was "highly correlated with [its] retail sales."

61.     Instagram accounts, with "artsy, professional-grade photographs to display its products and "evoke lifestyle feelings such as relaxation, freedom and sex appeal," reached a quarter million followers; JUUL-related YouTube videos exceeded 100,000 "and engagement with the videos was high"; and in 2017 JUUL-related tweets averaged 30,565 every month.[21]

---

[20] Id.

[21] Jidong Huang, et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, Tob. Control 2019, at 150, https://tobaccocontrol.bmj.com/content/tobaccocontrol/28/2/146.full.pdf.

62.     Other marketing efforts included billboards, magazine advertising, launch parties, free samples, and promotional tours, as well as efforts to create associations with other popular products, identifying itself, for instance, as "the iPhone of e-cigarettes."

63.     JUUL Labs adopted the same themes used by Philip Morris and other "big tobacco" companies in their long standing and far reaching marketing campaigns to glamorize cigarette smoking while downplaying its addictiveness and harmful health effects.

64.     Although social media may not have been around for the cigarette companies to use at the time, their themes of independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and "being cool" are the same themes that JUUL Labs associated with its products.

65.     The makers of Marlboro knew how important it was "to know as much as possible about teenage smoking patterns and attitudes" because "[t]oday's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens."[22]

66.     Accordingly, Marlboro tracked youth behavior and preference; tested and employed marketing themes that resonated with youth; and directed sales promotions, events, and sponsorships toward youth.[23]

67.     Whether this is something that JUUL Labs already knew or it was something they learned from its founders' review of the documents from the tobacco litigation, JUUL Labs has

---

[22] Philip Morris Special Report -- Young Smokers: Prevalence, Trends, Implications, and Related Demographic Trends, Mar. 31, 1981, at p. 6, http://tobaccofreedom.org/issues/documents/landman/youth/index.html

[23] *See, e.g., U.S. v. Philip Morris, et al.*, No. 99-cv-2496, Amended Final Opinion at p. 1006, 1072 (D.D.C. Aug. 17, 2006) (Kessler, J.).

done exactly the same thing, reaching millions of teens—on purpose and for the same reason as "big tobacco" did—in the process.

### Deceptive Marketing

68.     Despite making numerous revisions to its packaging since 2015, JUUL Labs did not add nicotine warnings until it was forced to do so in August 2018.  Many of JUUL Labs' advertisements also lacked a nicotine warning.

69.     JUUL Labs has fraudulently concealed material information about the addictive and adverse nature of its products, particularly material facts concerning nicotine content, addictiveness, and the physiological, emotional, and mental effects of the nicotine addiction its JUULpods fostered.

70.     Even when the presence of nicotine in the JUULpods was known, JUUL Labs failed to disclose the truth about its amount, concentration, and effects.

71.     For instance, JUUL Labs has repeatedly represented that a single JUULpod contains an amount of nicotine equivalent to about a pack of cigarettes, suggesting then that the delivery, and effect, of the nicotine from each source is equivalent.  But JUUL Labs knows that it is not just the ***amount*** of nicotine, but its concentration and the efficiency with which it is delivered into the bloodstream that determines the narcotic effect and risk of addiction.

72.     And JUUL Labs knows too that with the addition of benzoic acid and its "nicotine salt" formulation, its JUULpods accomplish more in terms of speed and amount of delivery—both of which affect the efficacy of its addictiveness—than one pack of cigarettes does or ever has.[24]

---

[24] *See, e.g.,* Neil L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, Handbook of Experimental Pharmacology 1982: 29-60 (Oct. 13, 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.

73.     JUUL Labs' description of its JUULpods as having 3% or 5% strength is also intentionally misleading and at odds with the industry standard of reporting concentration by volume, leading retailers and consumers to believe it contains less nicotine than other formulations.

74.     Many interpret the percentages to mean, for example, that the nicotine content in a JUULpod with 5% strength is, by volume, 50 mg/mL, which is not an accurate conversion.  In truth, the concentration is nearly 20% higher: 59 mg/mL.

75.     JUUL Labs' products have not been approved as a smoking therapy measure or smoking cessation device, but the products are routinely advertised in connection with JUUL Labs' "Switch" campaign as a safer, healthier alternative to smoking cigarettes.

76.     Further, as part of the same campaign, JUUL Labs offered "cost-savings" calculators to suggest that switching to JUUL branded products would save the consumer money over the continued purchase of conventional cigarettes.

77.     In truth, however, JUUL Labs knows, or should know, that smokers who "switch" to JUUL often increase their nicotine intake and consume more JUULpods or, alternatively, end up smoking cigarettes and JUULing.  Either way, the calculator shows savings that will likely never occur.

78.     Particularly alarming was the discovery that JUUL Labs developed programs in which it paid schools to allow JUUL Labs' representatives access to students in class, and sponsored weekend programs and summer camps, with some students as young as third-graders, under the guise of offering instruction on "holistic health education" and other health related topics.

79.     According to testimony given at a recent Congressional hearing, JUUL Labs used this access to promote JUULing, telling students that its vaping devices and JUULpods were "totally safe."[25]

80.     Emails between JUUL Labs' employees referred to the company's sponsorship of, and involvement in, summer camps, youth programs, and school visitations as "eerily similar" to tactics previously taken by "big tobacco" companies that attended "fairs and carnivals where they distributed various branded items under the guise of 'youth prevention.'"[26]

81.     At all relevant times, JUUL Labs knew that its products were not safe for non-smokers or minors, and posed a risk of aggravating nicotine addiction in those already addicted to cigarettes.

### Adverse Effects

82.     "Nicotine … causes addiction.  The pharmacologic and behavioral processes that determine [nicotine] addiction are similar to those that determine addition to drugs such as heroin and cocaine."[27]

83.     Both a stimulant and a relaxant, nicotine is absorbed into the body's bloodstream and goes to the brain where it binds to certain receptors and triggers the release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin.  This induces the feelings of pleasure, happiness, arousal, and relaxation, or the "buzz" that users often refer to.

---

[25] *See, e.g.,* Bloomberg, *JUUL Targeted Children at Schools and Online, U.S. House Panel Says*, Jul. 25, 2019, https://www.bloomberg.com/news/articles/2019-07-26/juul-targeted-children-at-schools-and-online-u-s-house-panel-says.

[26] *Id.*; The New York Times, *JUUL Targeted Schools and Youth Camps, House Panel on Vaping Claims*, Jul. 25, 2019, https://www.nytimes.com/2019/07/25/health/juul-teens-vaping.html.

[27] *The Health Consequences of Smoking: Nicotine Addiction: A Report of the Surgeon General*, 1988, at p. 9, https://profiles.nlm.nih.gov/NN/B/B/Z/D/.

84.     With regular nicotine use, however, the effect diminishes and more nicotine needs to be consumed to get that same "buzz."

85.     "Nicotine is well known to have serious systemic side effects in addition to being highly addictive.  It adversely affects the heart, reproductive system, lung, kidney, etc."[28]

86.     A study done by the American Journal of Medicine found that, among young adults who did not smoke cigarettes, those who "vaped" were more than four times as likely than non-vapers to start smoking traditional cigarettes within 18 months.[29]  And those who become smokers would likely die 10 years earlier than those who do not.[30]

87.     Inhaled into the lungs, nicotine is "rapidly absorbed into the pulmonary vernous circulation.  The nicotine then enters the arterial circulation and moves quickly from the lungs to the brain."[31]

88.     At the brain, nicotine "exerts long-term, maturational effects at critical stages of brain development [for adolescents]."  Worse, while the effects may be long-term, the causal exposure needs only to be brief and to a low dose to "produce lasting change" in the brain itself and its process of development, impacting not just addiction, but potentially both cognition and emotional regulation as well.[32]

---

[28] Aseem Mishra, et al., *Harmful Effects of Nicotine*, Indian J. Med. Paediatr Oncol., Jan.-Mar. 2015, at pp. 24-31, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/.

[29] Brian Primack, et al., *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naive US Young Adults*, The Am. J. of Medicine, Nov. 2017.

[30] Centers for Disease Control and Prevention, *Fast Facts*, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/fast_facts/index.htm.

[31] Neal Benowitz, *Nicotine Addiction*, N. Engl. J. Med., Jun. 17, 2010, at pp. 1-2, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2928221/pdf/nihms227888.pdf.

[32] Menglu Yuan, et al., *Nicotine and the adolescent brain*, J. Physiol 593.16, Aug. 2015, at pp. 3398, 3405-06 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/pdf/tjp0593-3397.pdf.

89.     "Nicotine exposure, increasingly occurring as a result of [vaping], may induce epigenetic changes that sensitize the brain to other drugs and prime it for future substance abuse."[33]

90.     "Seizures or convulsions are known potential side effects of nicotine toxicity," and the FDA has received an "uptick in voluntary reports of adverse experiences" mentioning seizures occurring with vaping.[34]

91.     Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.  Exposure to nicotine produces an increased risk of coronary vascular disease and peripheral arterial disorders.

92.     Moreover, because the use of JUULpods introduces foreign substances in addition to nicotine into the lungs, prolonged use of JUUL branded products is believed to produce chronic obstructive pulmonary disease, just like traditional cigarette smoke.  It also triggers immune responses associated with inflammatory lung diseases.

93.     Despite these dangers to users, JUUL Labs targeted youth in its marketing and promotional efforts even though such strategies had been determined to be unlawful were a tobacco company to use them.  JUUL Labs mined documents and information from the tobacco litigation proceedings to learn how "Big Tobacco" had been so successful in attracting minors to their products and ensuring their loyalty (and JUUL Labs' revenue) through nicotine addiction.

94.     JUUL Labs did not stop at unlawful marketing and promotion though, or even at just stocking its vaping devices with the standard, lesser amount of nicotine as other manufacturers.  Instead, JUUL Labs specially formulated the liquids in the JUULpods to deliver more nicotine in

---

[33] *Id.* at p. 3397.

[34] U.S. Food & Drug Administration, *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, Apr. 10, 2019, https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults.

higher concentrations in a way that would make the delivery of all that nicotine quicker and easier to consume.[35]

95.      JUUL Labs knew or should have known that Plaintiffs and the members of the proposed class would be unable to discern, understand, and/or fully appreciate the physiological effects of the patented "nicotine salt" in the JUULpods, or the scientific manipulations behind its formulation.

96.      Further, JUUL Labs knew or should have known that Plaintiffs and the members of the proposed class would be unable to discern, understand, and/or fully appreciate from JUUL Labs' representations and omissions concerning its products what the actual nature and characteristics of its products were.

97.      JUUL Labs knows or should know that individuals who use its products are more than four times as likely to start smoking traditional cigarettes than those individuals who do not, and those who do become smokers will likely die 10 years before those who do not.  But JUUL Labs marketed and promoted their products anyway, intentionally targeting minors as well.

98.      JUUL Labs' unlawful practices, including deception, false promises, misrepresentations, and/or the concealment, suppression, and omission of material facts in connection with the sale, distribution, and/or advertisement of its products, were outrageous because of JUUL Labs' evil motive and/or its conscious disregard or reckless indifference to the

---

[35] *See, e.g.,* "On top of that, the e-liquid contains 50 mg of nicotine per ml of e-liquid. When you consider the fact that many e-cigarettes top out at just 16 mg, you can see what's going on here. The JUUL delivers a fast nicotine punch like no other e-cigarette on the market." (https://ecigone.com/e-%20cigarette-reviews/juul-e-cigarette-review/); "Each official Juul pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter) They're the tool of choice for people looking for a bigger hit of nicotine without the harsh taste …." (https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-Juul/); "The Juul Pods are manufactured with 50mg nicotine salts but deliver a smooth and flavorful vaping experience." (https://www.tracyvapors.com/collections/starter-kit/products/juul-starter-kit).

rights and interests of Plaintiffs and the members of the proposed class.

99.     In its conduct relating to the marketing, promotion, and sale of its products, including to minors, JUUL Labs committed intentional wanton, willful, and outrageous acts and/or acted with a reckless disregard for the rights and interests of Plaintiffs and the members of the proposed class.

100.    As a result of JUUL Labs' conduct alleged herein, the jury should be permitted to return a verdict for an award of punitive damages that will serve to punish JUUL Labs and deter others from like conduct.

## CLASS ALLEGATIONS

101.    Plaintiffs bring this class action under Federal Rule of Civil Procedure 23 individually and on behalf of the following class of similarly situated persons:

**All Missouri residents who purchased and/or used products manufactured by JUUL Labs primarily for personal, family, or household use.**

102.    Excluded from the class is JUUL Labs, including any parent, subsidiary, affiliate or controlled person of JUUL Labs; JUUL Labs' officers, directors, agents or employees; the judicial officers assigned to this litigation, and members of their staffs and immediate families.

103.    The proposed class meets all requirements for class certification.

104.    The proposed class satisfies the numerosity standards because it is sufficiently numerous that joinder of all such persons in the class would be impracticable.

105.    There are questions of fact and law common to the proposed class which predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class arising from JUUL Labs' actions include, without limitation, the following:

(i)     whether, in marketing and selling its products, JUUL Labs misrepresented, concealed, omitted, and/or suppressed the dangers and risks to the health of persons using the products;

(ii)    whether JUUL Labs misrepresented in, and/or omitted from, its marketing, advertisements, promotional materials and public statements, among other things, the safety and effects of its products;

(iii)   whether JUUL Labs failed to warn adequately of the risks of adverse effects of its products;

(iv)    whether JUUL Labs unlawfully marketed its products to minors;

(v)     whether JUUL Labs knew or should have known that the use of its products could lead to serious adverse health effects;

(vi)    whether JUUL Labs continued to manufacture, market, distribute, and sell its products in a manner inconsistent with its true knowledge of the products' dangerous and adverse nature;

(vii)   whether JUUL Labs knowingly omitted, suppressed, or concealed material facts about the unsafe and defective nature of its products from government regulators, the medical community, and/or the consuming public;

(viii)  whether JUUL Labs' conduct violated Missouri's Merchandising Practices Act; and

(ix)    whether JUUL Labs' conduct warrants an award of punitive damages.

106.    The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior, with respect to considerations of consistency,

economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy.

107.    Plaintiffs' claims are typical of the claims of the class in that Plaintiffs' claims and those of the class all arise from, and as a result of, JUUL Labs' conduct.

108.    Plaintiffs are adequate representatives of the proposed class because they are members of the class and their interests do not conflict with the interests of the other members of the proposed class that they seek to represent.

109.    Plaintiffs and their undersigned counsel, who have extensive experience prosecuting complex litigation matters, including class actions, will fairly and adequately protect the interests of the proposed class.

110.    The presentation of separate actions by individual class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for JUUL Labs, and/or substantially impair or impede the ability of class members to protect their interests.

111.    Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy.  It would be impracticable and undesirable for each member of the proposed class who suffered harm to bring a separate action.

112.    In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

113.    Notice can be provided to class members by using techniques and forms of notice similar to those customarily used in other drug-related cases and complex class actions.

## CAUSES OF ACTION

### Count One
### Violation of the Missouri Merchandising Practices Act

114.    Plaintiffs incorporate by reference paragraphs 1 through 113 as though fully restated and set forth herein.

115.    As set forth above, JUUL Labs engaged in unlawful practices, including deception, false promises, misrepresentation, and/or the concealment, suppression, and omission of material facts in connection with the sale, distribution, and/or advertisement of its products.

116.    The acts and practices engaged in by JUUL Labs constitute unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Ann. Stat. §§ 407.010 *et seq.*

117.    In connection with such acts and practices, Plaintiffs and the members of the proposed class purchased for personal, family, or household purposes JUUL branded vaping devices and JUULpods.

118.    Because of the unlawful, unfair, and/or fraudulent acts and/or business practices of JUUL Labs, Plaintiffs and the members of the proposed class sustained an ascertainable loss of money and/or property.

119.    Such loss includes significant exposure to toxic substances, which may cause or contribute to causing disease and injurious physical conditions; nicotine addiction; and economic harm in that they would not have purchased JUUL Labs' products or would have paid less for the products if they had known the true facts, and/or they paid a premium as a result of JUUL Labs' unlawful, unfair, and/or fraudulent acts and/or business practices.

**Count Two**
**Strict Product Liability—Design Defect**

120.   Plaintiffs incorporate by reference paragraphs 1 through 119 as though fully restated and set forth herein.

121.   In the course of its business, JUUL Labs designed, engineered, manufactured, and sold its vaping devices and JUULpods.

122.   JUUL Labs intended that consumers use its vaping device to ingest the large amounts of concentrated nicotine and other chemicals contained in the JUULpods.

123.   JUUL Labs' products were sold in a defective condition because:

(i)   they create, nurture, and sustain an addiction to nicotine, a harmful substance;

(ii)   they were sold as a safer, healthier alternative to smoking cigarettes when, in fact, they contained more nicotine than cigarettes contained and could deliver that nicotine to the user's bloodstream quicker than cigarettes could, thereby creating and/or increasing the user's dependence on nicotine and JUUL branded products to feed the addiction;

(iii)   they would make users four times as likely to start smoking traditional cigarettes within 18 months than those who did not use JUUL Labs' products (and those who did start smoking traditional cigarettes would likely die 10 years earlier than those who did not);

(iv)   they put users at a greater risk of experiencing seizures and other physically debilitating conditions, including respiratory and cardiovascular problems, gastrointestinal problems, and nicotine poisoning;

(v)   their design for nicotine content, formulation, and delivery increases the propensity of abnormal electrical activity in the brain, producing "lasting change" impacting

not just addiction, but potentially both cognition and emotional regulation as well;

(vi)     they make it easier for youth to initiate the use of nicotine and to progress to nicotine dependence; and/or

(vii)    they were sold with these harmful and injurious characteristics without regard for the users' age or knowledge.

124.    In light of the above, the defective condition in which JUUL Labs sold its products was unreasonably dangerous when used in the reasonably anticipated manner.

125.    The risks inherent in the design of JUUL branded products outweigh significantly any benefits of such design.

126.    At all relevant times, JUUL Labs could have employed reasonably feasible alternative designs to prevent the harms and injuries set forth above.

127.    Plaintiffs and the members of the proposed class were harmed and/or damaged as a direct and proximate result of the defective condition that existed when JUUL Labs' products were sold.

128.     Such harm and/or damage includes significant exposure to toxic substances, which may cause or contribute to causing disease and injurious physical conditions; nicotine addiction; and economic harm.

**Count Three**
**Negligence—Defective Product**

129.    Plaintiffs incorporate by reference paragraphs 1 through 128 as though fully restated and set forth herein.

130.    JUUL Labs failed to use ordinary care in the design, engineering, manufacturing, and sale of its vaping devices and JUULpods and/or failed to warn of the risk of harm, injury, and/or damage inherent in the use of its vaping devices and JUULpods.

131.   A legal duty existed on the part of JUUL Labs to exercise a reasonable degree of care to protect Plaintiffs and the members of the proposed class from harm, injury, and/or damage caused by JUUL Labs' products.

132.   JUUL Labs knew or should have known that the defective condition in which it sold its products was likely to harm, injure, and/or damage Plaintiffs and the members of the proposed class.

133.   JUUL Labs breached the duty it owed to Plaintiffs and the members of the proposed class.  More specifically, JUUL Labs:

(i)     created, nurtured, and sustained nicotine addiction in the users of JUUL Labs' products;

(ii)    sold their products as a safer, healthier alternative to smoking cigarettes when, in fact, they contained more nicotine than cigarettes contained and could deliver that nicotine to the user's bloodstream quicker than cigarettes could, thereby creating and/or increasing the user's dependence on nicotine and JUUL branded products to feed the addiction;

(iii)   made users of their products four times as likely to start smoking traditional cigarettes within 18 months than those who did not use JUUL Labs' products (and those who did start smoking traditional cigarettes would likely die 10 years earlier than those who did not);

(iv)    put users at a greater risk of experiencing seizures and other physically debilitating conditions, including respiratory and cardiovascular problems, gastrointestinal problems, and nicotine poisoning;

(v)     designed its products with a specific amount, formulation, and delivery system for

nicotine knowing the harmful and addictive effects of nicotine and the other toxic chemicals in the JUULpods;

(vi) designed its products with a specific amount, formulation, and delivery system for nicotine knowing that the design would increase the propensity of abnormal electrical activity in the brain, producing "lasting change" impacting not just addiction, but potentially both cognition and emotional regulation as well;

(vii) made it easier for youth to initiate the use of nicotine and to progress to nicotine dependence; and/or

(viii) sold its products with these harmful and injurious characteristics without regard for the users' age or knowledge.

134. Plaintiffs and the members of the proposed class were harmed and/or damaged as a direct and proximate result of JUUL Labs' conduct and its products and/or JUUL Labs' failure to warn of the risk of harm, injury, and/or damage inherent in the use of its vaping devices and JUULpods.

135. Such harm and/or damage includes significant exposure to toxic substances, which may cause or contribute to causing disease and injurious physical conditions; nicotine addiction; and economic harm.

**Count Four**
**Negligence**

136. Plaintiffs incorporate by reference paragraphs 1 through 135 as though fully restated and set forth herein.

137. JUUL Labs failed to use ordinary care in the marketing, promotion, and sale of its vaping devices and JUULpods and/or failed to warn of the risk of harm, injury, and/or damage inherent in the use of its vaping devices and JUULpods.

138.     A legal duty existed on the part of JUUL Labs to exercise a reasonable degree of care to protect Plaintiffs and the members of the proposed class from harm, injury, and/or damage caused by JUUL Labs' products.

139.     More specifically, JUUL Labs owed a duty to Plaintiffs and the members of the proposed class to exercise a degree of reasonable care in, among other things:

(i)      ensuring that its marketing and promotional efforts and activities were neither directed to, nor targeted at, minors;

(ii)     ensuring that JUUL vaping devices and JUULpods were not sold and/or distributed to minors;

(iii)    ensuring that its products were not designed in a manner that made them unduly attractive to minors;

(iv)     designing a product that is not defective and unreasonably dangerous;

(v)      designing a product that will not addict youth or other users to nicotine, particularly where such youth or others are unaware of the products' nicotine content, concentration and/or effect; and

(vi)     adequately warning of any reasonably foreseeable adverse events with respect to its vaping devices and/or JUULpods.

140.     JUUL Labs knew or should have known that the nature and characteristics of its products would likely harm, injure, and/or damage Plaintiffs and the members of the proposed class.

141.     JUUL Labs knew or should have known that its failure to warn of the nature and characteristics of its products would likely harm, injure, and/or damage Plaintiffs and the members of the proposed class.

35

142.    JUUL Labs breached the duty it owed to Plaintiffs and the members of the proposed class.  More specifically, JUUL Labs:

(i)    created, nurtured, and sustained nicotine addiction in the users of JUUL Labs' products;

(ii)    sold their products as a safer, healthier alternative to smoking cigarettes when, in fact, they contained more nicotine than cigarettes contained and could deliver that nicotine to the user's bloodstream quicker than cigarettes could, thereby creating and/or increasing the user's dependence on nicotine and JUUL branded products to feed the addiction;

(iii)    made users of their products four times as likely to start smoking traditional cigarettes within 18 months than those who did not use JUUL Labs' products (and those who did start smoking traditional cigarettes would likely die 10 years earlier than those who did not);

(iv)    put users at a greater risk of experiencing seizures and other physically debilitating conditions, including respiratory and cardiovascular problems, gastrointestinal problems, and nicotine poisoning;

(v)    designed its products with a specific amount, formulation, and delivery system for nicotine knowing the harmful and addictive effects of nicotine and the other toxic chemicals in the JUULpods;

(vi)    designed its products with a specific amount, formulation, and delivery system for nicotine knowing that the design would increase the propensity of abnormal electrical activity in the brain, producing "lasting change" impacting not just addiction, but potentially both cognition and emotional regulation as well;

36

(vii)   made it easier for youth to initiate the use of nicotine and to progress to nicotine dependence; and/or

(viii)   sold its products with these harmful and injurious characteristics without regard for the users' age or knowledge.

143.   Plaintiffs and the members of the proposed class were harmed and/or damaged as a direct and proximate result of JUUL Labs' conduct and its products and/or JUUL Labs' failure to warn of the risk of harm and/or damage inherent in the use of its vaping devices and JUULpods.

144.   Such harm and/or damage includes significant exposure to toxic substances, which may cause or contribute to causing disease and injurious physical conditions; nicotine addiction; and economic harm.

<div align="center">

**Count Five**
**Unjust Enrichment**

</div>

145.   Plaintiffs incorporate by reference paragraphs 1 through 144 as though fully restated and set forth herein.

146.   Believing JUUL Labs' representations concerning its products to be true, and being unaware of the material information JUUL Labs omitted and withheld concerning the nicotine content, concentration, and effects of the liquid in the JUULpods, Plaintiffs and the members of the proposed class repeatedly and routinely purchased and used JUUL vaping devices and JUULpods.

147.   JUUL Labs knew that its marketing, promotional, and sales practices were inducing such purchases, leading to substantial revenue increases year over year since its inception.

148.   And JUUL Labs accepted and retained such benefit knowing all the while that the purchasers of its products, including youth, did not know that use of the products would lead to the adverse consequences set forth above.

149.     In short, JUUL Labs' exploitations of Plaintiffs and the members of the proposed class led to JUUL Labs' own unjust enrichment.

150.     Under the circumstances, it would be against equity and good conscience to permit JUUL Labs to retain the ill-gotten benefits it received.  Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiffs and class members for the monies paid to Defendants for its defective JUUL products.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, Plaintiffs, individually and on behalf of the members of the proposed class, request that this Court enter judgment against JUUL Labs and in Plaintiffs' favor, awarding the following relief:

(i)      a trial by jury on all issues;

(ii)     certification of the proposed class;

(iii)    actual and/or compensatory damages, including the amounts paid by Plaintiffs and the members of the proposed class, for JUUL Labs' products;

(iv)     the establishment and funding of a medical-monitoring program;

(v)      restitution and disgorgement of profits;

(vi)     punitive damages in an amount that is fair and reasonable, but that will serve to deter JUUL Labs and others from like conduct in the future;

(vii)    attorneys' fees and costs available under the law;

(viii)   pre and post judgment interest; and

(ix)     such other and further relief, at law or in equity, as this Court deems just and proper.

Dated:  August 28, 2019          Respectfully submitted,

**SCHLICHTER, BOGARD & DENTON, LLP**


 /s/ *Kristine K. Kraft*          
Jerome J. Schlichter, #32225
jschlichter@uselaws.com
Kristine K. Kraft, #37971
kkraft@uselaws.com
Scott H. Morgan, #61853
smorgan@uselaws.com
100 South 4th Street, Suite 1200
St. Louis, Missouri 63012
(314) 621-6115
(314) 621-6151 (fax)

**ATTORNEYS FOR PLAINTIFFS**

39